**John D. RILEY, Plaintiff,**

v.

**FAIRGROUNDS AUTO AUCTION, INC., Defendant.**

**Civ. A. No. 4995.**

United States District Court
W. D. Kentucky,
Louisville Division.

Dec. 15, 1965.

Herbert L. Segal and Robert Chenault, Louisville, Ky., for plaintiff.

James U. Smith, Jr., and Louis Woolery, Louisville, Ky., for defendant.

JAMES F. GORDON, District Judge.

This is a suit under section 16(b) of the Fair Labor Standards Act of 1938, as amended [29 U.S.C. § 216(b)], otherwise commonly known and referred to as the Federal Wage and Hour Law, in which the plaintiff, John D. Riley, seeks to recover of his former employer, Fairgrounds Auto Auction, Inc., alleged unpaid overtime compensation in the amount of $4,403.96, plus an equal amount in liquidated damages, plus a reasonable attorney's fee.

The plaintiff's complaint in this case is not clear as to whether he is proceeding on the theory of individual employee coverage under the Act, that is, coverage under the Act as it was written prior to the 1961 amendments (Fair Labor Standards Amendments of 1961, as enacted May 5, 1961, P.L. 87–30, 75 Stat. 65), or on the theory of so-called "enterprise

11. P.L. 89–110, 79 Stat. 437, 89th Cong. S. 1564.

coverage" which was brought into the Act by the 1961 amendments.

At the pre-trial conference the Court required plaintiff's counsel, at the request of defendant's counsel, to specify the theory of coverage upon which plaintiff was proceeding. The Court is advised that plaintiff's counsel thereafter informed defendant's counsel that he was proceeding on the theory of individual rather than enterprise coverage, and this was reaffirmed by plaintiff's counsel at the trial.

The defendant, by appropriate answer, denied coverage under the Act, denied that it was indebted to plaintiff for any unpaid overtime, and by way of affirmative defenses pleaded certain exemptions under the Act, among which was the defense that during his employment by defendant, plaintiff was a bona fide executive or administrative employee as such terms were and are defined and delimited by the regulations of the Secretary of Labor under Section 13 (a)(1) of the Act [29 U.S.C. § 213(a) (1)], and thus plaintiff was not entitled to the benefits of the Act.

The case was tried to the Court without a jury on December 8, 1965 and at the conclusion of plaintiff's case, counsel for the defendant moved the Court to dismiss the complaint on two grounds, namely: that plaintiff had failed to carry the burden of proving that while in defendant's employ he was "engaged in commerce or in the production of goods for commerce" within the meaning of Sections 6 and 7, and 3(j) of the Act [29 U.S.C. 206, 207, and 203(j)]; and that plaintiff's proof affirmatively established that plaintiff was an exempt "administrative" employee while in defendant's employ.

I find it unnecessary to decide the first ground for defendant's motion to dismiss the complaint, in view of the fact that the Court finds, even when taking plaintiff's evidence in the light most favorable to him and resolving all doubts about the evidence in plaintiff's favor, that the complaint must be dismissed on the second ground asserted by defendant.

## FINDINGS OF FACT

1. The defendant, Fairgrounds Auto Auction, Inc. (hereafter referred to simply as "FAA") is a Kentucky corporation which is engaged in the business of auctioning used automobiles (and occasionally new automobiles) at an auction held on Tuesday of each week. From the time FAA first began business, and throughout the entire period of time covered by plaintiff's suit, these auctions were held at the Kentucky Fair and Exposition Center in Louisville, Kentucky, except for a brief period each year when the Kentucky State Fair was in progress, on which latter occasions the auction was temporarily held at another location in Louisville. FAA conducts its business on a portion of the Kentucky Fair and Exposition Center's premises which it holds under a sublease agreement from the Exposition Center's lessees.

2. FAA's customers are licensed automobile dealers who place automobiles in FAA's auctions to be sold and licensed automobile dealers who bid upon and purchase these automobiles at FAA's weekly auctions. FAA is paid a fee by the dealer-seller, and after plaintiff had been employed for a time, it also instituted a charge against the dealer-buyers. When an automobile is sold at auction, FAA collects from the buyer and then settles with the seller, giving the seller its check for the purchase price, less the auction fee charged the seller.

3. The plaintiff, John D. Riley, was employed by FAA in June of 1963 when FAA was first beginning business, and was continuously employed by FAA from approximately June 18, 1963 until March 30, 1965.

4. During the entire period of his employment by FAA, Mr. Riley was compensated for his services on a salary basis of not less than $100.00 per week. When he was first employed, his salary was $100.00 per week. In the week ending May 12, 1964 his salary was increased to $125.00 per week, and in the week ending October 20, 1964 his salary was again increased to $135.00 per week. Mr. Riley admitted, and the Court finds as a fact,

that he was paid his full salary each and every week during the entire period of his employment with FAA, and that no deduction was ever made from his salary on account of his absence from work, including a period of approximately a month (from the latter part of January to the latter part of February, 1965) when Mr. Riley was in the hospital for surgery.

5. During the period of his employment by FAA, Mr. Riley performed the following principal duties:

(a) During approximately the first year of Mr. Riley's employment, FAA performed the service for dealer-sellers in and around Louisville of picking up automobiles at the dealer-sellers' place of business on Monday afternoons and evenings and Tuesday mornings, and driving them to the auction site at the Exposition Center. This was accomplished by FAA transporting its drivers (who at first were men, but later on were women and who were referred to in the testimony as "driveway girls") to the dealers' places of business, whereupon the FAA drivers would take the cars designated by the dealers and drive them to FAA's place of business to be sold at auction in the Tuesday sale. (This service or practice was discontinued in June or July, 1964, after one of the driveway girls was killed in an automobile accident on the Watterson Expressway, near Louisville. Thereafter the dealer-sellers delivered the vehicles to FAA at the Exposition Center.) On many occasions Mr. Riley transported the driveway girls to dealers' places of business on Monday and Tuesday. Other employees of FAA also transported the driveway girls, however, including Mr. W. O. Isaacs, the president and principal stockholder of FAA, and Mr. Yondell Embry, another officer and stockholder of FAA. Mr. Riley testified that he transported the driveway girls at the request of or upon instructions from Mr. Isaacs.

(b) An important and recurring activity of FAA was to contact automobile dealers by telephone on Saturday and Monday, in an effort to persuade or solicit them to attend FAA's Tuesday auctions as either a buyer or seller, or both. Mr. Isaacs, Mr. Embry, Mr. Riley and a Mr. Al Cook (who testified as a witness for the plaintiff) all made these telephone calls, working from prepared lists of automobile dealers. Mr. Riley testified that he made these calls to dealers on instructions from Mr. Isaacs.

(c) FAA's weekly automobile auctions usually began at approximately 1:00 P.M. on Tuesday. There were two lines of automobiles moving simultaneously through the auction. The "A" line was comprised of older model vehicles and the newer models were in the "B" line. All vehicles were given an FAA auction registration number and Mr. Riley frequently assigned these numbers prior to the commencement of the auction. There were usually from 12 to 15 driveway girls in attendance on auction days, and Mr. Riley assigned them to work in either the A line or the B line. He also assigned one or two driveway girls to remain at the registration booth to drive automobiles which were brought in by dealers while the auction was in progress. If the driveway girls experienced any difficulty with an automobile (such as finding it to be out of gas, or being unable to start an automobile) or otherwise encountered any problems in connection with their work, they would call upon Mr. Isaacs, Mr. Embry or Mr. Riley, whichever was the most readily available, for assistance and instructions.

(d) On Tuesday afternoons while the automobile auction was in progress, Mr. Riley acted as "turn down" or "reject" man for the auction, which the testimony for the plaintiff shows to be an extremely important function in the success of an automobile auction, and one which requires the exercise of considerable discretion and judgment. At the FAA auctions, automobiles were sold under three different conditions of sale, viz: "as is", "auction guaranteed" (which meant that the motor block, transmission and differential were guaranteed), and "subject to a ride and a drive" (which in essence meant that the vehicle was sold

subject to the purchaser's approval). The owner of the vehicle prescribed which of these conditions of sale would apply, and the majority of cars were sold "subject to a ride and a drive". Riley testified that in hundreds of such cases while he was employed by FAA, controversy arose between the buyer and the seller, and it was his function, as FAA's "reject" or "turn down" man to act as mediator in these disputes and attempt to compose the differences between the buyer and the seller, and thus finalize the sale. A necessary element in each case was the exercise of discretion and judgment as to how best to handle the particular situation so that the sale would be finalized. During the entire time he was in FAA's employ, Riley was the only person in the organization who performed the "reject" or "turn down" man's function.

(e) During approximately the first year of his employment with FAA, Riley was frequently "on the road" on Wednesdays, Thursdays and Fridays, visiting other automobile auctions and automobile dealers in cities such as Indianapolis, Evansville, Muncie, Fort Wayne, Bowling Green and Cincinnati, for the purpose of making personal contacts with dealers and soliciting and persuading them to attend FAA's Tuseday auctions. He performed these assignments without supervision, and reported back to Mr. Isaacs the results of his trips.

(f) Occasionally during the first year of his employment, Riley would work in the FAA office on Wednesday, Thursday or Friday, settling accounts with dealer-buyers and sellers, handling automobile title papers, preparing and making bank deposits of both cash and checks, and getting out solicitation mailings to dealers. After approximately a year in FAA's employ Riley virtually ceased making trips out of town to call on dealers and visit other auctions, and thereafter for the remainder of the term of his employment, devoted himself to these office duties. Mr. Isaacs was always present at the office, and performed the same functions. Riley and Isaacs were usually the only

FAA personnel in the office on Wednesday, Thursday and Friday. If Mr. Isaacs went to the bank or was otherwise away from the office, Riley was in sole charge of the office, during which periods of time he settled accounts with dealers, answered inquiries over the telephone, and otherwise did whatever had to be done about the office. On the occasions that Riley went to the bank to make bank deposits or was otherwise out of the office for any reason on these days, Mr. Isaacs was in sole charge of the office. During at least the last six months of his employment, Mr. Riley had the combination to the safe in the FAA office and handled large amounts of the Company's money represented by both checks and cash.

(g) Many automobiles were sold at the FAA auctions on what is referred to in the testimony as a "title attached" basis. In these cases the dealer-seller would draw a draft for the sale price on FAA with title papers to the vehicle attached to the draft. These drafts were handled through FAA's bank, and when a draft was presented for payment the bank would notify Mr. Riley or Mr. Isaacs and either Riley or Isaacs would then go down to the bank personally, examine the title papers, and if they were in good order would authorize the bank to honor the draft on FAA's account.

6. During the period in controversy, the plaintiff's work was of such a nature as to include all of the powers and duties described in Sections (a) through (c) of 29 C.F.R. § 541.2, and those paragraphs are aptly descriptive of the work actually performed by him. The plaintiff's work was of such a nature as to qualify him in all respects as an exempt administrative employee within the meaning of 29 C.F.R. § 541.2.

CONCLUSIONS OF LAW

1. The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1337 and § 16(b) of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 216 (b).

2. At all pertinent times the plaintiff was employed by the defendant in a bona fide administrative capacity within the meaning of Section 13(a) (1) of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 213(a) (1).

3. The plaintiff is not entitled to recover of the defendant in this action.

4. An appropriate judgment · in accordance with the findings of fact and conclusions of law expressed herein will be submitted by counsel for the defendant on notice, in accordance with the rules of this Court.